IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Scurmont LLC, d/b/a Calli Baker's Firehouse Bar & Grill, and Heath W. Scurfield, an individual, | ) ) ) ) | C/A No. 4:09-cv-00618-RBH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **ORDER** |
| Firehouse Restaurant Group, Inc., a Florida corporation, Three Alarm Subs, Inc., a South Carolina corporation, and Fireside Restaurant Company, Inc., a South Carolina corporation, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

This is a trademark dispute between competing restaurants. Defendant Firehouse Restaurant Group, Inc. ("FRG") is the franchiser of the FIREHOUSE SUBS® restaurant franchise that operates more than 350 locations throughout various parts of the United States, including Myrtle Beach, South Carolina. The core menu item offered by FIREHOUSE SUBS® is submarine-style sandwiches. Defendants Three Alarm Subs, Inc. ("Three Alarm") and Fireside Restaurant Company, Inc. ("Fireside") are franchisees who own and operate FIREHOUSE SUBS® restaurants in the Myrtle Beach area. Plaintiff Scurmont, LLC ("Scurmont") also operates a restaurant in Myrtle Beach, South Carolina under the name CALLI BAKER'S FIREHOUSE BAR & GRILL ("CALLI BAKER'S"). CALLI BAKER'S is a full-service restaurant that offers a variety of menu items and incorporates a firehouse theme in its décor and menu. Plaintiff Heath Scurfield ("Scurfield") is the sole member of Scurmont and is an active-duty firefighter with Horry County Fire Rescue.

1

FRG has filed for and obtained more than 60 federal trademark and service mark registrations for its marks from the United States Patent and Trademark Office ("USPTO"). Of the 60 or more registered marks obtained by FRG, one mark is the term "FIREHOUSE" for use in restaurant services: Registration Number 3,173,030 ("FIREHOUSE word mark"). This mark appears to be the subject matter of the Plaintiffs' Complaint, specifically their Third Cause of Action for Trademark Cancellation due to Fraud. In their Counterclaim, the Defendants assert against the Plaintiffs, 34 of FRG's United States federal registrations (the "Registrations"), which include various forms of FIREHOUSE® and FIREHOUSE SUBS® marks used by the Defendants in connection with their business. The Registrations cover use of FRG's marks in connection with a broad scope of goods and services that include restaurant services, food products, sandwich platters, sandwiches, drinks, soups, salads, cookies, brownies, catering services, and restaurant franchising.

## Statement of Undisputed Facts

I:        Parties and Marks

FRG operates the FIREHOUSE SUBS® restaurant franchise. (Sorensen Decl. ¶2, Docket # 135-2). FIREHOUSE SUBS® restaurants offer a menu of submarine style sandwiches, drinks, salads, chili, dessert items, and related food products using a firefighter theme. (Id. ¶8; Defs.['s] Exs. A-1 & A-2, Docket #s 135-3 to -5). The first FIREHOUSE SUBS® restaurant opened in Jacksonville, Florida in October 1994. (Sorensen Decl. ¶3). Since that time, the chain has grown to more than 375 restaurants in 21 states. (Sorensen Dep., pp.34-37, Docket # 138-13). FRG operates more than 35 FIREHOUSE SUBS® restaurants throughout South Carolina. (Sorensen Decl. ¶10). The first FIREHOUSE SUBS® restaurant in South Carolina opened in 1998 in Georgetown, and a second restaurant opened two years later in Myrtle Beach. Both of those stores are now closed. (Sorensen Dep., pp.39-40). Nonetheless, the FIREHOUSE

SUBS® restaurant franchise has been very successful. Since its inception in 1994, its annual gross revenues have increased exponentially.  In 1999, following 6 years of operation, sales exceeded $10 million.  Six years later, in 2005, sales exceeded $100 million, and sales have doubled since then. (Sorensen Decl. ¶20).

FRG is the owner of the Registrations listed below:

| MARK | REG. NO. | REG. DATE | Class/Use |
|---|---|---|---|
|  | 1,903,135* | July 4, 1995 | Restaurant Services |
|  | 1,983,934* | July 2, 1996 | Restaurant Services, Providing of Food and Drink |
| FIREHOUSE SUBS | 2,606,263* | August 13, 2002 | Restaurant Services specializing in submarine style sandwiches for public consumption |
|  | 2,756,249* | August 26, 2003 | Conducting employee incentive award programs to promote ownership of employee-owned franchise restaurants |
|  | 2,795,059* | December 16, 2003 | Charitable Fund Raising |
| FIREHOUSE SUBS | 2,795,060* | December 16, 2003 | Charitable Fund Raising |
|  | 2,866,824* | July 27, 2004 | Clothing, namely, t-shirts, golf shirts and polo shirts |
| FIREHOUSE | 3,000,715 | September 27, 2005 | Clothing, namely shirts |
| FIREHOUSE SUBS FIRST RESPONDER RELIEF FUND | 3,006,000 | October 11, 2005 | Charitable fundraising; charitable fundraising services for victims of natural disasters and other catastrophes |
|  | 3,006,002 | October 11, 2005 | Charitable fundraising, namely, a fund for victims of natural disasters and other catastrophes |

3

| | | | |
|---|---|---|---|
| FIREHOUSE SUBS | 3,012,834 | November 8, 2005 | Restaurant Franchising |
| FIREHOUSE SUBS | 3,012,835 | November 8, 2005 | Restaurant Services |
| **FIREHOUSE SUBS** | 3,014,796 | November 15, 2005 | Restaurant Franchising |
| **FIREHOUSE STEAK SUB** | 3,017,189 | November 22, 2005 | sandwiches |
| **FIREHOUSE "HERO" SUB** | 3,017,190 | November 22, 2005 | sandwiches |
| **FIREHOUSE SUBS** | 3,027,225 | December 13, 2005 | Cereal based snack foods; foods, namely cookies and brownies |
| FIREHOUSE SUBS | 3,027,226 | December 13, 2005 | Cereal based snack foods; foods, namely cookies and brownies |
| **FIREHOUSE SUBS** | 3,031,377 | December 20, 2005 | Pastries and desert items, namely cookies and brownies |
| FIREHOUSE SUBS | 3,031,378 | December 20, 2005 | Pastries and desert items, namely cookies and brownies |
| **FIREHOUSE PARTY PLATTERS** | 3,034,141 | December 27, 2005 | Catering services and restaurant services |
| **FIREHOUSE SUBS** | 3,063,736 | February 28, 2006 | Stickers |
| FIREHOUSE SUBS | 3,063,737 | February 28, 2006 | Stickers |
| **FIREHOUSE SUBS** | 3,065,955 | March 7, 2006 | Bags, namely paper bags |
| **FIREHOUSE SUBS** | 3,070,837 | March 21, 2006 | Hats; toy vehicles |
| FIREHOUSE SUBS | 3,070,838 | March 21, 2006 | Hats; toy vehicles |

4

| | | | |
|---|---|---|---|
| FIREHOUSE SUBS | 3,070,844 | March 21, 2006 | Bags, namely paper bags |
| FIREHOUSE SUBS | 3,082,197 | April 18, 2006 | Paper for wrapping and packaging of food |
| FIREHOUSE SUBS | 3,082,196 | April 18, 2006 | Paper for wrapping and packaging of food |
| FIREHOUSE | 3,173,030 | Nov. 21, 2006 | Restaurant Services |
| FIREHOUSE SUBS Feed the Fire. | 3,136,447 | Aug. 29, 2006 | Restaurant Services |
| FIREHOUSE SUBS Feed the Fire. | 3,136,446 | Aug. 29, 2006 | Restaurant Franchising |
| FIREHOUSE SUBS | 3,261,752 | July 10, 2007 | Gift cards; Magnetically encoded credit cards |
| FIREHOUSE FUNDS | 3,330,363 | November 6, 2007 | Magnetically encoded credit cards |
| FIREHOUSE SUBS | 3,382,694 | February 12, 2008 | Financial services in the field of money lending; Consumer lending services |

(Sorensen Decl. ¶15; *see* Defs.['s] Ex. A-4, Docket # 135-13). FRG incorporates its marks into its food

products and services. (Sorensen Decl. ¶12). For example, a FIREHOUSE SUBS® menu includes

sandwiches named FIREHOUSE MEATBALL®, FIREHOUSE STEAK AND CHEESE®, and

FIREHOUSE HERO®. (*Id.*; Defs.['s] Exs. A-1 & A-2). The marks appear on displays placed on restaurant

tables, carry-out bags, stickers, sandwich paper, cups, free sub cards, and other materials. (Sorensen Decl.

¶12; Defs.['s] Ex. A-3, Docket #s 135-6 to -12). Additionally, since the opening of the first FIREHOUSE

SUBS® store, the term "Firehouse" has been used verbally by FIREHOUSE SUBS® employees. (Sorensen

Decl. ¶13). Specifically, employees greet restaurant visitors by saying, "Welcome to Firehouse!" (*Id.*).

Defendant Three Alarm is owned by Bryan and Mary Paquin. (Bryan Paquin Dep., p.15,

Docket # 138-16). Three Alarm owns and operates one FIREHOUSE SUBS® restaurant, which is located

5

at 560 Highway 17 North, North Myrtle Beach, also known as the "Gator Hole" location. (*Id.* at 7). The FIREHOUSE SUBS® restaurant at Gator Hole is approximately five miles north of CALLI BAKER'S. (*See id.* at 73). It has been in business since 2006. (*Id.* at 13). Defendant Fireside is owned by Deborah and Steve Duncan. (Deborah Duncan Dep., p.12, Docket # 138-17). Fireside owns and operates three FIREHOUSE SUBS® restaurants, which are located in Socastee, Surfside, and Myrtle Beach. The one in Myrtle Beach is located at 38th Avenue North, in the Bi-Lo Center at Plantation Point, and has been open since November 2000. (*Id.* at 13, 52). The Myrtle Beach restaurant is about five miles south of CALLI BAKER'S. (*Id.* at 76). The Surfside and Socastee locations are about 10 to 15 miles further south. (*Id.*). FIREHOUSE SUBS® franchisees such as Three Alarm and Fireside execute franchise agreements granting them certain rights that include the exclusive right to operate their FIREHOUSE SUBS® restaurants within defined territories. (Sorensen Decl. ¶¶21-25; Defs.['s] Exs. BB, BB-1 & BB-2, Docket #s 141-3 to -4) Further, franchisees pay a franchise fee, royalties, and advertising percentages in return for the exclusive use of the FIREHOUSE SUBS® marks, brand and reputation, and FRG's business assistance. (*Id.*).

Plaintiff Scurfield is an active-duty captain with the Horry County Fire Rescue. (Scurfield Dep., p.10, Docket # 138-11). In 2005, Scurfield and his friend, Jack Montgomery, decided to acquire an existing restaurant that they frequented called "Calli Baker's Roadhouse Bar & Grill." (*Id.* at 43-44). Scurfield admits that he had dined at a FIREHOUSE SUBS® restaurant several years prior to acquiring "Calli Baker's Roadhouse Bar & Grill." (Scurfield Resp. to Req. for Admis. ¶¶39-40, Docket # 137-2). Scurmont was formed as part of the partnership between Scurfield and Mr. Montgomery. Attorney Marshall Biddle represented Scurmont in the acquisition of "Calli Baker's Roadhouse Bar & Grill." (Scurfield Dep., p.58). At the closing, Mr. Montgomery asked Attorney Biddle whether there would be any problem if they changed the name of the restaurant to "Calli Baker's Firehouse Bar & Grill." (*Id.* at 234-36). Following

6

the acquisition, they renamed the restaurant to "Calli Baker's Firehouse Bar & Grill" and renovated the interior with a firefighter theme. (*Id.* at 119-21). Scurfield subsequently acquired Mr. Montgomery's interest in Scurmont, and he is now its sole member. (*Id.* at 62-63). Both before and after the name change, the restaurant has been commonly referred to by the local community as "CALLI BAKER'S." (Debbie Breyare Aff. ¶¶ 8-9, Docket # 83-1).  CALLI BAKER'S is a full-service restaurant that serves lunch and dinner and offers a full menu of appetizers, soups, salads, sandwiches, steaks, hamburgers, seafood, and desserts. (*See* Scurfield Dep., pp.149-55; Pls.['s] Attach. to Ex. O, Docket # 105-1).  CALLI BAKER'S operates using the following logo on its menu and printed material:



(Scurfield Resp. to Req. for Admis. ¶43; Defs.['s] Exs. F-1, F-2, & F-5, Docket #s 136-11, -12, -15, & -16).

Additionally, CALLI BAKER'S uses the following signage at its restaurant:

  

(Scurfield Resp. to Req. for Admis. ¶¶44-47; Defs.['s] Ex. F-2).

II:     Services and Facilities

CALLI BAKER'S is a full-service, sit down dining restaurant that offers lunch and dinner.  It offers a full menu of appetizers, soup, salads, sandwiches, steaks, hamburgers, seafood, and desserts. (*See* Scurfield Dep., pp.149-55; Defs.['s] Exs. F-1 & F-5.   It has a full bar, serves alcohol, and offers "happy hour" and karaoke nights. (Defs.['s] Exs. F-1 & F-5).  Customers are seated by a host or hostess. (*See* Scurmont's Answers to Defs. First Set of Interrogs., p.6).  Orders are taken at the customer's table, and food and drinks are delivered to the table by wait staff. (*Id.*).  CALLI BAKER'S also offers take-out and catering services to customers of all ages, and offers entrees for less than $10.00. (Scurfield Resp. to Req. for Admis. ¶¶35-37, 52, 61-71).  Additionally, the restaurant is located in a free-standing building. (*See id.* ¶¶44-47; Defs.['s] Ex. F-2).  In the parking lot, a fire truck is parked right beside the restaurant. (*Id.*).  The inside of the restaurant is decorated with memorabilia from firefighters and policemen from all over the country. (*See* Defs.['s] Ex. F-2; Scurfield Dep., pp.119-21; Scurfield Resp. to Req. for Admis. ¶72).

FIREHOUSE SUBS® restaurants offer a menu of submarine style sandwiches, drinks, salads, chili, dessert items, and related food products using a firefighter theme. (Sorensen Decl. ¶8; Defs.['s] Exs. A-1 & A-2).  Sub sandwiches are the "core" item on the FIREHOUSE SUBS® menu, which does not include many of the items offered by full-service restaurants, such as appetizers, hamburgers, and grilled seafood and shrimp. (*See* Sorensen Dep., pp.120, 194).  FIREHOUSE SUBS® restaurants do not offer alcohol, "happy hour," or karaoke. (*Id.* at 194).  Customers order at the counter, and drinks and potato chips are self-service. (*Id.* at 193-96).  The food is brought to the customer's table, but it is "self-seating" and customers typically clear their own tables. (*Id.* at 194-95).  FIREHOUSE SUBS® restaurants offer lunch and dinner, either dine-in or take-out, and catering services to customers of all ages. (*Id.* at 195-96; Sorensen Decl. ¶9; *see* Defs.['s] Ex. A-1).  Almost all entrees cost less than $10.00. (*See* Defs.['s] Exs. A-1

8

& A-2).  Additionally, FIREHOUSE SUBS® restaurants are mostly located in strip malls and are typically between 1750 and 1800 square feet. (*Id.* at 196-97).

III:     Methods of Advertising

CALLI BAKER'S has engaged in limited advertising since it has been owned by Scurmont. (*See* Scurfield Dep., pp.89-104).  CALLI BAKER'S promotes its business by distributing flyers and promotional materials. (Scurfield Resp. to Req. for Admis. ¶26).  Its paid advertising has been limited to print advertising, such as coupon books, and a website. (Scurfield Dep., pp.113-14; Scurfield Resp. to Req. for Admis. ¶28; Scurmont's Answers to Defs. First Set of Interrogs., pp.4-5).  The restaurant has never paid to advertise on television, radio, or a billboard. (Scurfield Dep., pp.107-15).

FIREHOUSE SUBS® employs outside marketing firms to conduct advertising campaigns on behalf of the entire FIREHOUSE SUBS® "system." (Sorensen Dep., pp.128, 200-201).  The types of advertising employed by FIREHOUSE SUBS® include radio, television, billboard, merchandise, and print advertising, such as flyers, promotional materials, and coupon magazines. (*See id.* at 128; Don Fox Dep., pp.43-45, Docket # 84-1; *see also* Defs.['s] Ex. A-3; Deborah Duncan Dep., p.52; Doug Reifschneider Decl. ¶¶32-34, Docket # 138-2).  Additionally, FIREHOUSE SUBS® franchisees are required to spend 2%-3% of gross sales on local radio and print advertising. (Sorensen Dep., p.129; Doug Reifschneider Decl. ¶31).  System-wide, FIREHOUSE SUBS® has spent tens of millions of dollars on advertising over the past ten years. (*See* Defs.['s] Ex. A-7, Docket # 138-1).

Moreover, over the past six years, FIREHOUSE SUBS® has engaged advertising agencies to conduct marketing and research studies designed to measure consumer brand and advertising awareness (Doug Reifschneider Decl. ¶¶9-10).  Between 2005 and 2008, four "wave" marketing studies were conducted to measure the consuming public's awareness of the FIREHOUSE SUBS® brand and its

competitive position in relation to other major submarine sandwich chains in the following eleven markets: Jacksonville, Florida; Tallahassee, Florida; Pensacola, Florida/Mobile, Alabama; Orlando, Florida; Birmingham, Alabama; Little Rock, Arkansas; Greenville, South Carolina; Charlotte, North Carolina; Austin, Texas; Dallas, Texas; and Atlanta, Georgia. (*Id.* ¶¶9-19; *see* Defs.['s] Ex. C-1, Docket #s 138-3 to -5).  In 2009, a "Firehouse Hijacks" research study was conducted to better understand the consuming public's barriers and motivations to visit a FIREHOUSE SUBS® restaurant; Myrtle Beach, South Carolina, was one of the markets in which this study was conducted. (Doug Reifschneider Decl. ¶¶9, 21-24; *see* Defs.['s] Ex. C-2, Docket # 138-6).  All of these studies confirmed that FIREHOUSE SUBS® advertising has had a positive customer impact, as the majority of the consuming public is aware of the FIREHOUSE SUBS® brand and views FIREHOUSE SUBS® positively compared to competing submarine sandwich chains. (*See* Doug Reifschneider Decl. ¶¶17, 19-23).  This conclusion is also evident by the many industry awards, both local and national, that FIREHOUSE SUBS® has received over the years. (*See id.* ¶¶25-29; Defs.['s] Exs. C-3 & C-4, Docket #s 136-7 to -8).

IV:    Customer Inquiries

In 2005, when Scurmont acquired CALLI BAKER'S, the restaurant was located at 511 Lake Arrowhead Road, in Myrtle Beach. (Scurfield Dep., p.49).  CALLI BAKER'S moved to 10131 North King's Highway in June 2008. (Scurmont's Answers to Defs. First Set of Interrogs., p.5). Prior to June 2008, CALLI BAKER'S never received any inquiries, complaints, or notices of there being any confusion with FIREHOUSE SUBS®. (Scurfield Dep., p.227).  Shortly after CALLI BAKER'S relocated to its current location, a few customers began to inquire about the affiliation between CALLI BAKER'S and FIREHOUSE SUBS®. (*See* Defs.['s] Ex. F-4, Docket # 136-14).  In fact, Plaintiffs admit that customers at CALLI BAKER'S have asked a CALLI BAKER'S employee whether CALLI BAKER'S is a

10

FIREHOUSE SUBS® restaurant on at least three occasions. (Scurfield Resp. to Req. for Admis. ¶18). CALLI BAKER'S employees recorded no more than 10 instances of possible consumer confusion. (Scurfield Dep., p.228). However, employees of Three Alarm allege a substantially larger number of customer inquiries regarding the affiliation between its restaurant and CALLI BAKER'S.  In June 2008, just before CALLI BAKER'S opened for business at its new location, Scurfield received a "cease and desist" letter from counsel for the Defendants insisting that CALLI BAKER'S change its name to something other than "Firehouse." (Pls.['s] Ex. V, Docket # 89-1).

<u>V:</u>     <u>Other "Firehouse" Restaurants and Users</u>

The word "Firehouse" is, and has in the past, been used by restaurants and other businesses in the food service industry.  FRG admits that one or more restaurants, besides CALLI BAKER'S and FIREHOUSE SUBS®, have in the past used the word "Firehouse" in their names. (FRG Resp. to First Req. for Admis. ¶5, Docket # 81-7).  FRG also admits that one or more other restaurants currently use the word "Firehouse" in their names. (*Id.* ¶4).  Before the first FIREHOUSE SUBS® opened for business in Florida, there were other "Firehouse" restaurants in business, which are still in business today.  For example, there is a "Frankie's Firehouse Restaurant" in Somersville, Connecticut. (*See* Pls.['s] Ex. M, Docket # 83-3). Frankie's Firehouse Restaurant has been in existence since 1980. (*Id.* ¶3).  There is also a "Firehouse Tavern" in Parkville, Maryland, that has been in business since 1986. (*See* Pls.['s] Ex. L, Docket # 83-2). In Johnson City, Tennessee, there is "The Firehouse" restaurant, which has been in business since the early 1980s. (Sorensen Dep., pp.89-91 & Ex. 9 thereto).  There is also a "Firehouse Grill & Pub" in Tampa, Florida, that started doing business under the "Firehouse" name long before the first FIREHOUSE SUBS® opened for business. (*Id.* at 45 & Ex. 6 thereto).

11

The Plaintiffs claim that over 100 restaurants and/or cafes are using the word "Firehouse" in their names. (*See* Pls.['s] Exs. C & D, Docket #s 81-5 to -6). A simple internet search reveals dozens of other "Firehouse" restaurant locations or food related businesses, which appear to have no affiliation with FIREHOUSE SUBS®. (*See* Pls.['s] Exs. N & EEE, Docket #s 102-1 & 147-1 to -2). There are also numerous web addresses that include the word "Firehouse" and that will lead the searcher to a website not owned by FRG. (*See* FRG Resp. to First Req. for Admis. ¶¶7-8; FRG Resp. to Second Req. for Admis. ¶¶9-71, Docket # 81-8). Furthermore, an internet search of state-level government records for registered trademarks and corporations incorporating the "Firehouse" name reveals dozens, if not hundreds, of past and present users of the word "Firehouse"- both within and outside the food and beverage industry. (*See* Pls.['s] Ex. FFF, Docket #s 147-3 to -5).

The USPTO has issued registrations to other "Firehouse" users in the food and hospitality industry:

(a) Reg. No. 3,311,648, issued for "Fifth Alarm Firehouse Pub" in Byron, Illinois, on October 16, 2007 (Pls.['s] Ex. Y, Docket # 91-1);

(b) Reg. No. 3,272,304, issued for "Frankie's Firehouse Restaurant" on July 31, 2007 (Pls.['s] Ex. BB, Docket # 92-2);

(c) Reg. No. 3,210,279, issued for "Danny's Firehouse Chili Recipe" on February 20, 2007 (Pls.['s] Ex. AA, Docket # 92-1);

(d) Reg. No. 3,389,782, issued for "Firehouse Java" on February 26, 2008 (Pls.['s] Ex. Z, Docket # 91-2);

(e) Reg. No. 3,500,729, issued for "Firehouse Cooking" on September 16, 2008 (Pls.['s] Ex. CC, Docket # 93-1);

(f) Reg. No. 3,591,991, issued for "Firehouse Cooking" on March 17, 2009 (Pls.['s] Ex. DD, Docket # 93-2); and

(g) Reg. No. 2,806,118, issued for "Firehouse" on January 20, 2004 (Pls.['s] Ex. EE, Docket # 93-3).

The USPTO has also issued a number of registrations to "Firehouse" users in connection with other goods

and services, such as moving services, financial services, veterinary services, real estate services, and the publishing and entertainment industries. (*See* Pls.['s] Exs. FF to YY, Docket #s 94-1 to 100-1). In addition, the USPTO has issued registration certificates to users of the word "Firehouse" in connection with emergency response services. (*See* Pls.['s] Exs. ZZ, AAA, & BBB, Docket #s 100-2 to -4).

Nonetheless, FRG argues that its registered marks are protectable, as it has actively policed its marks by diligently asserting its rights in the FRG marks in more than twenty proceedings in federal court and before the USPTO, seeking to cancel third-party registrations or to oppose pending applications containing the word "Firehouse," and by issuing more than fifteen cease and desist letters to other restaurants using the term "Firehouse" in their names. (Sorensen Decl. ¶28).  FRG claims that it has asserted and defended its registered marks in federal lawsuits filed in Arkansas, Virginia, North Carolina, South Carolina, and Puerto Rico, and that each of those lawsuits resulted in the accused infringer changing its name. (*Id.*).  Moreover, FRG claims that in each case where it sent a cease and desist letter, the accused infringer either changed its business name or went out of business. (*Id.*; *see* Defs.['s] Ex. A-12, Docket # 135-24).

## **Procedural History**

In June 2008, counsel for the Defendants issued a cease and desist letter to Scurfield stating that CALLI BAKER'S use of the word "Firehouse" was infringing on FRG's trademarks.  In March 2009, the Plaintiffs filed an action for declaratory judgment of non-infringement and also asserted various other claims.  The Defendants filed a separate lawsuit alleging trademark infringement under the Lanham Act and common law.  The cases were consolidated in January 2010. On June 2, 2010, the Plaintiffs filed their [46] Second Amended Complaint.  The Second Amended Complaint asserts three causes of action against the Defendants: (1) Declaratory Judgment for Non-Infringement of Trademarks, (2) South Carolina Unfair

13

Trade Practices Act, and (3) Trademark Cancellation Due to Fraud. On July 6, 2010, the Defendants filed their [49] Answer and Affirmative and Additional Defenses to Plaintiffs' Second Amended Complaint, Counterclaim, and Demand for Attorneys' Fees and Jury Trial. Accordingly, the Defendants allege the following counterclaims against the Plaintiffs: (1) Federal Trademark Infringement (15 U.S.C. § 1114), (2) False Designation of Origin (15 U.S.C. § 1125(a)), (3) Common Law Trademark Infringement and Unfair Competition, and (4) Unjust Enrichment.[1]

In December 2010, the Defendants filed a [77] Motion to Strike Expert Witness Report of William O. Bearden and to Exclude the Testimony of William O. Bearden at Trial. Subsequently, the Plaintiffs filed a [79] Motion in *Limine* to Exclude Testimony of George M. Thomas, [80] Motion in *Limine* to Exclude Testimony and Rebuttal Report of Peter Sealey, and [81] Motion for Partial Summary Judgment.[2] In February 2011, the Defendants filed a [135] Motion for Summary Judgment or, in the alternative, Partial Summary Judgment on all counts asserted in the Second Amended Complaint and all remaining counterclaims. Thus, pending before the Court are three motions to exclude expert testimony/reports and two cross-motions for partial summary judgment. On June 30, 2011, the Court held a hearing on these motions (the "motions hearing"), and the issues are ripe for review.

-------------------

[1]The Defendants also alleged the Plaintiffs violated South Carolina's Unfair Trade Practices Act. However, this counterclaim was withdrawn with the Plaintiffs' consent. *See* Text Order, Docket # 64 (denying as moot the Plaintiffs' Motion to Strike Counterclaim)

[2]The Plaintiffs move for summary judgment on: (1) Plaintiff's First Cause of Action for Declaratory Judgment of Non-Infringement, (2) Defendants' First Counterclaim for Trademark Infringement pursuant to 15 U.S.C. § 1114, (3) Defendants' Second Counterclaim for False Designation of Origin pursuant to 15 U.S.C. § 1125(a), and (4) Defendants' Third Counterclaim for Common Law Trademark Infringement and Unfair Competition.

## Discussion

## I:    Defendants' Motion to Strike Expert Witness Report of William O. Bearden and to Exclude the Testimony of William O. Bearden at Trial.

At issue are five pages in Dr. Bearden's expert report under the heading "opinions to be expressed and their bases and reasons." (*See* Bearden Report, pp.4-9, Docket # 77-2).  FRG requests that the Court strike Dr. Bearden's expert report and exclude his expert testimony at trial on several grounds including the following: (1) Dr. Bearden's opinions are not based on any methodology, specialized knowledge, or reliable technique or theory; (2) Dr. Bearden's opinions would not be helpful to the jury; and (3) Dr. Bearden's proposed testimony usurps the role of the fact-finder because it proffers legal opinions and conclusions and unfairly casts the Plaintiffs' legal arguments as expert testimony.

"[Q]uestions of fact that are committed to the jury are the proper subject of opinion testimony." *United States v. McIver,* 470 F.3d 550, 561 (4th Cir. 2006) (citing Fed. R. Evid. 704(a)); *see generally Anheuser-Busch, Inc. v. L. & L. Wings, Inc.,* 962 F.2d 316, 318 (4th Cir. 1992) (Likelihood of confusion is an "inherently factual" determination which is "particularly amenable to resolution by a jury."). "However, opinion testimony that states a legal standard and draws a legal conclusion by applying law to the facts is generally inadmissible." *McIver,* 470 F.3d at 561-62 (citing *United States v. Barile,* 286 F.3d 749, 760 (4th Cir. 2002)).  The district court's task "is to distinguish [helpful] opinion testimony that embraces an ultimate issue of fact from [unhelpful] opinion testimony that states a legal conclusion." *Barile,* 286 F.3d at 760.  Rule 702 of the Federal Rules of Evidence contemplates that the court will evaluate whether the testimony is reliable and can aid the ultimate trier of fact. *Morehouse v. Louisville Ladder Group, LLC,* No. 3:03-887-22, 2004 WL 2431796, at *3 (D.S.C. June 28, 2004).  Pursuant to Rule 702, expert testimony is admissible if it will assist the trier of fact and is (1)"based upon sufficient facts

15

or data," (2) "the product of reliable principles and methods," and (3) "the principles and methods [have been applied] reliably to the facts of the case." *PBM Prods., LLC v. Mead Johnson & Co.,* 639 F.3d 111, 123 (4th Cir. 2011) (citing Fed. R. Evid. 702). As the Supreme Court has explained, evidence is admissible under Rule 702 if "it rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 597 (1993). The Fourth Circuit has noted that "[a] reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999). Accordingly, a two-part test is relevant in cases such as this one: (1) whether the expert witness is qualified, and (2) if qualified, whether his opinion is reliable, in that it is based on sufficient facts and sound methodology. *Morehouse,* 2004 WL 2431796 at *4.

FRG does not challenge Dr. Bearden's qualifications at this time; therefore, the Court immediately turns to the reliability of Dr. Bearden's expert testimony. As an initial matter, counsel for the Plaintiffs conceded at the motions hearing that Dr. Bearden may not present expert testimony as to "6. Alleged Infringer's Intent," and such would be improper. Additionally, Dr. Bearden may not present expert testimony as to "7. Actual Confusion." As counsel for the Plaintiffs acknowledged at the motions hearing, Dr. Bearden's proffered opinion as to this factor appears to be based solely on evidence in the record without conducting any independent consumer surveys or polls, which are usually performed in cases of this type. His opinion as to this factor would not aid the jury, as it is simply based on what other employees/witnesses will testify to. Nonetheless, the Court finds that Dr. Bearden's remaining proffered expert opinions and corresponding portions of his expert report are admissible.

Dr. Bearden is an expert in consumer marketing and brand awareness. He has conducted extensive research on the development of brand attitudes and consumer perceptions of brands. In addition to his

16

scholarly and teaching endeavors, he serves on the editorial review boards of several prestigious marketing journals.  In his expert report, Dr. Bearden identified the data and information he considered in forming his expert opinions and his methodology, which included a review of various documents in the case, as well as in-person inspections of both the Defendants' and Plaintiffs' restaurants, and independent research of other users of the FIREHOUSE word mark in the restaurant industry.  Dr. Bearden visited the parties' respective restaurants; compared their respective signage, physical amenities, services, and menus; and examined their respective marks in terms of color, size, font, and other aspects of appearance.  Using the seven likelihood of confusion factors announced by the Fourth Circuit in *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1529 (4th Cir. 1984) to organize his expert report, Dr. Bearden then analyzed the data and information that he gathered through his independent study and analysis to opine as to whether a likelihood of confusion exists.  His proffered opinions as to factors One through Five are based on his specialized knowledge as a marketing and brand awareness expert and, therefore, are sufficiently reliable enough to warrant their admission.

Moreover, the Court finds that his proffered expert opinions as to these factors are both relevant and helpful to the jury.  As demonstrated by his expert report, Dr. Bearden conducted a detailed examination of the parties' respective businesses and the marks used by each.  He has conducted an independent investigation into the FIREHOUSE word mark as it is used in the restaurant industry and opined on the weakness of the FIREHOUSE SUBS®  brand.  His in-depth analysis of the relative strength, distinctiveness, and similarity of the parties' marks will assist the jury in reaching its own conclusion as to likelihood of confusion.  Finally, Dr. Bearden's proffered expert opinions as to factors One through Five do not usurp the role of the jury by stating the ultimate legal conclusion the jury should reach as to trademark infringement.  Dr. Bearden's proffered expert testimony merely states why he believes there is

17

not a likelihood of confusion between CALLI BAKER'S use of the word "Firehouse" and FRG's registered marks.  As such, the Defendants' Motion to Strike Expert Witness Report of William O. Bearden and to Exclude the Testimony of William O. Bearden at Trial is granted in part, denied in part.  Specifically, Dr. Bearden is precluded from testifying as to "6. Alleged Infringer's Intent" and "7. Actual Confusion."  Otherwise, he is qualified, and the remainder of his proffered testimony is relevant and sufficiently reliable.[3]

**II:    Plaintiffs' Motion in *Limine* to Exclude Testimony and Rebuttal Report of Peter Sealey, Ph.D.**

The Plaintiffs have filed a motion in *limine* for an order excluding the testimony and rebuttal report of expert witness Peter Sealey, Ph.D.  The Plaintiffs argue that "Dr. Sealey's rebuttal report is nothing more than an indictment on the credentials and qualifications of Plaintiffs' marketing expert, William O. Bearden, Ph.D. . . . [and] submit that Dr. Bearden's credentials and qualifications are not the proper subject of an expert rebuttal report and/or expert opinion." (Pls.['s] Mot. in *Limine* to Exclude Test. & Rebuttal Report of Peter Sealey, Ph.D, pp.1-2) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999)). In response, FRG argues that the Plaintiffs' motion should be denied because "courts regularly permit experts to testify at trial about the reliability of an opposing expert's opinions." (Defs.['s] Resp. to Pls.['s] Mot. in *Limine*, p.3).

The Plaintiffs argue that Dr. Sealey's report is basically an attack on the qualifications of Dr. Bearden to testify as an expert witness.  However, the Defendants have never challenged Dr. Bearden's

---

[3]The Defendants argue that "[t]he Court should also exclude Dr. Bearden's report because it is not verified," as "[u]nsworn testimony is not admissible in the consideration of summary judgment motions." (Defs.['s] Mem. in Opp'n to Pls.['s] Mot. for Partial Summ. J., p.18, Docket # 141).  This argument is moot, as the Defendants filed a motion to file Dr. Bearden's deposition transcript, which incorporated his expert report, and the motion was granted without objection. (*See* Docket #s 159 & 160).

qualifications.  It is for the Court to determine whether Dr. Bearden is qualified to give expert testimony.

Notwithstanding, Dr. Sealey may opine as to why he believes that Dr. Bearden's conclusions are unreliable,

even if the basis for his opinion is that Dr. Bearden's lack of practical experience in the discipline of

marketing led Dr. Bearden to an erroneous conclusion.  Dr. Sealey's report rebuts the substance and

reliability of Dr. Bearden's expert opinions.  Dr. Sealey questions the reliability of Dr. Bearden's marketing

opinions and likelihood of confusion conclusion given the fact that Dr. Bearden "has no professional or

managerial experience in the practical or real world of marketing." (Rebuttal Report of Dr. Sealey, p.5,

Docket # 80-1).  Specifically, Dr. Sealey opines that Dr. Bearden's "lack of practical experience in the

discipline of marketing has led Dr. Bearden to disregard vitally important elements in the marketing of

brands that has, as an end result, led him to arrive at a fundamentally incorrect conclusion." (*Id.*).  Further,

Dr. Sealey cites four critical components of a brand's identity that Dr. Bearden omits from his report,

presumably as a result of his lack of experience, and this is proper rebuttal testimony. *Cf. United States v.*

*Stitt,* 250 F.3d 878, 897 (4th Cir. 2001) (defining rebuttal evidence as "[e]vidence given to explain, repel,

counteract, or disprove evidence offered by the adverse party.").  As such, the Plaintiffs' Motion in *Limine*

to Exclude Testimony and Rebuttal Report of Dr. Sealey is denied.

**III:**     **Plaintiffs' Motion in *Limine* to Exclude Testimony and Report of George M. Thomas**

The Defendants seek to "introduce expert testimony on limited topics that relate to Mr. Thomas's

experience as an intellectual property attorney." (Defs.['s] Resp. To Pls.['s] Mot. in *Limine* to Exclude

Testimony & Report of George M. Thomas, p.4, Docket # 119).  The Defendants intend to present, and the

Plaintiffs have moved to exclude, the opinions and testimony of Mr. Thomas as follows:

(1) Testimony regarding the application and registration process of trademarks and service marks before the USPTO as well as the general practice and procedures of the USPTO;

(2) Whether FRG's conduct before the USPTO demonstrates conduct which is fraudulent;

(3) Testimony regarding whether a trademark holder is obligated to pursue all potential infringers in order to pursue an action against Plaintiffs and testimony regarding the circumstances under which a trademark holder may choose not to take action against an infringer;

(4) Testimony regarding the meaning and significance of third-party trademark registrations, whether registrations constitute a verification that the marks are placed in commercial use by third-parties, the duty of registrants to provide proof of use during the term of the registration, and an opinion on how those registrations affect the enforceability of a registered mark; and

(5) Testimony as to the connection between the names of the parties' respective businesses due to the use of the word "Firehouse."[4]

A:    Testimony as to whether FRG's conduct before the USPTO demonstrates fraudulent conduct (#2)

The Plaintiffs seek cancellation of one of FRG's registered marks based on allegations of fraud by FRG before the USPTO. As the Fourth Circuit has noted, "[a] number of courts have held that procurement of a trademark registration through the use of false or misleading statements does not constitute fraud within the meaning of 15 U.S.C. § 1115(b)(1) unless the statements were both *material to the decision* to grant the registration and *made with a deliberate intent* to defraud." *Brittingham v. Jenkins,* 914 F.2d 447, 453-54 (4th Cir. 1990) (emphasis added). According to the Defendants, "Mr. Thomas's testimony will relate directly to the issues of whether any statements or actions taken by FRG were misleading and *material* and whether they manifest a *deliberate intent.*" (Defs.['s] Resp. To Pls.['s] Mot. in *Limine* to Exclude Testimony & Report of George M. Thomas, p.6). At the motions hearing, however, counsel for the Defendants clarified that Mr. Thomas will not offer testimony concerning FRG's intent. Additionally, Defendants state that Mr. Thomas "will also offer testimony as to whether FRG has engaged in any conduct

---

[4]Because some issues have become moot, the Defendants submitted a highlighted version of Mr. Thomas's report which delineates the specific opinions that the Defendants intend to offer at trial. *See* Docket # 119-1.

that would constitute fraud on the [US]PTO."[5] (*Id.* at 6).  The Plaintiffs have moved to exclude Mr. Thomas's proffered expert testimony as impermissible legal conclusions and opinion testimony as to the ultimate issue of whether FRG committed fraud before the USPTO.

"[T]estimony by a witness in the form of a legal conclusion is clearly inadmissible." *Hermitage Indus. v. Schwerman Trucking Co.,* 814 F. Supp. 484, 486-87 (D.S.C. 1993).  Moreover, testimony on ultimate issues

> "must be otherwise admissible under the Rules of Evidence." *Weinstein's Federal Evidence* § 704.03[1] (2d ed. 2002).  This means that the testimony must be helpful to the trier of fact, in accordance with Rules 701 and 702, and must not waste time, in accordance with Rule 403.  "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach . . . ." *United States v. Barile,* 286 F.3d 749, 759-60 (4th Cir. 2002) (quoting Fed. R. Evid. 704 advisory committee's notes).  The touchstone of admissibility of testimony that goes to the ultimate issue, then, is helpfulness to the jury. *Kopf,* 993 F.2d at 377-78 (stating that while "[a]n opinion is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact, . . . such an opinion may be excluded if it is not helpful to the trier of fact") (internal quotation marks omitted); *Weinstein's Federal Evidence* § 704.04[2][a] ("The most common reason for excluding opinion testimony that gives a legal conclusion is lack of helpfulness . . . .").  Thus, the district court's task "is to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion," . . . *Barile,* 286 F.3d at 760.

*United States v. Perkins,* 470 F.3d 150, 157-58 (4th Cir. 2006).  Whether a misrepresentation made to the USPTO is "material" encompasses a legal conclusion that is for the jury to decide. *See* J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 31:67 (West 2010) (In the context of fraud relating to a trademark application, the standard for materiality is exclusively defined: a material representation to the USPTO exists where, "but for the misrepresentation, the federal registration either

---

[5]The Defendants have represented to the Court that "[a]lthough the opinion on page 10 of the Thomas Expert Report utilizes the term 'fraud,' his testimony at trial will not utilize this term but will focus on the conduct and representations to the [US]PTO by Defendant [FRG], the reasonableness of such conduct." *Id.* at 9 n.4.

would not or should not have issued."); *cf. United States v. David,* 83 F.3d 638, 640 n.2 (4th Cir. 1996) (stating that materiality has a specialized legal meaning and defining materiality as having "a natural tendency to influence agency action or [capability] of influencing agency action.")   Thus, Mr. Thomas's proffered testimony relating to the materiality of FRG's statements and actions before the USPTO would be unhelpful to the jury and is excluded.   Similarly, Mr. Thomas may not testify as to whether FRG acted with deliberate intent. FRG's "intent with respect to [its trademark applications] is a question for the trier of fact to decide and does not require the admission of expert testimony." *See BorgWarner, Inc. v. Honeywell Int'l, Inc.,* 750 F. Supp. 2d 596, 611 (W.D.N.C. 2010) (citation omitted).   Additionally, such testimony would be speculative at best and is excluded.   Mr. Thomas may testify, however, as to the *reasonableness* of FRG's actions before the USPTO. *See United States v. Barile,* 286 F.3d 749, 759-60 (4th Cir. 2002) ("Opinion testimony on whether the data submitted in a 510(k) submission were reasonable would not merely state a legal conclusion and therefore is not excludable on the ground that it invades the province of the jury . . . . [A]n expert opinion on whether various aspects of the 510(k) submissions . . . were reasonable is precisely the type of expert testimony that could assist the trier of fact in its determination.") (citing Fed. R. Evid. 702).

B:      Testimony on the parties' "connection" due to their respective uses of the word "Firehouse" (#5)

        Defendants seek to offer Mr. Thomas's opinions and testimony on the alleged "connection" between the parties' businesses due to the use of the word "Firehouse."   Rule 702 of the Federal Rules of Evidence provides in relevant part that expert testimony must be "based upon sufficient facts or data." Fed. R. Evid. 702.   "A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999) (citation omitted).   Additionally,

"[t]he Fourth Circuit has also held that where lay jurors are fully able to understand and appreciate the implications of the evidence admitted, proffered expert testimony will not assist the jury in determining a factual issue; and is therefore inappropriate." *Minnesota Lawyers Mut. Ins. Co. v. Batzli,* No. 3:09cv432, 2010 WL 670109, at *2 (E.D. Va. Feb. 10, 2010) (citing *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 324 (4th Cir. 1982)).

Mr. Thomas's expert report contains only a one paragraph explanation of his speculative opinion that the "viewer of the Scurfields mark and the surroundings might assume that the restaurant happens to be a FRG restaurant managed by or franchised to a person named Calli Baker. Thus, there is a direct and obvious connection between [the parties' marks]." (Expert Report of George M. Thomas, p.15, Docket # 119-1). Mr. Thomas appears to base this opinion solely on the pictures included in the Second Amended Complaint. (*Id.*) Unlike Dr. Bearden, Mr. Thomas has engaged in no independent research and, based solely on his analysis of pictures of the signage outside each parties' restaurants, reaches the conclusion that there is a "connection" between the parties' respective restaurants. This proffered opinion testimony will not assist the jury in determining a factual issue, as lay jurors are fully able to recognize that both parties utilize the word Firehouse in their marks and signage. Additionally, this proffered opinion testimony is unreliable, as it is not based on sufficient data or specialized knowledge. Thus, Mr. Thomas's proffered expert testimony on the similarity of the parties' marks and any perceived connection between their respective restaurants is excluded.

C:    Other proffered testimony (#s 1, 3, & 4)

At the motions hearing, counsel for the parties agreed that Mr. Thomas may offer testimony regarding the application and registration process of trademarks and service marks before the USPTO as well as the general practices and procedures of the USPTO. Mr. Thomas also intends to testify as to

28

whether a trademark holder is obligated to pursue all potential infringers, the meaning and significance of third-party trademark registrations, and the enforceability of registered trademarks. The Court finds that Mr. Thomas's opinions as to these issues are relevant, helpful to the jury, and do not constitute impermissible legal conclusions. As such, the Plaintiffs' Motion in *Limine* to Exclude Testimony and Report of George M. Thomas is granted in part, denied in part. Specifically, Mr. Thomas is precluded from presenting expert testimony as to the materiality of FRG's actions before the USPTO, whether FRG acted with deliberate intent before the USPTO, whether FRG's conduct before the USPTO was fraudulent, and the similarity of the parties' marks and any perceived connection between the parties' respective restaurants.

**IV:     Plaintiffs' Motion for Partial Summary Judgment**

In their Motion for Partial Summary Judgment, the Plaintiffs move for summary judgment on: (1) Plaintiff's First Cause of Action for Declaratory Judgment of Non-Infringement, (2) Defendants' First Counterclaim for Trademark Infringement pursuant to 15 U.S.C. § 1114, (3) Defendants' Second Counterclaim for False Designation of Origin pursuant to 15 U.S.C. § 1125(a), and (4) Defendants' Third Counterclaim for Common Law Trademark Infringement and Unfair Competition. While each cause of action has its own elements, they each require two *common* elements as explained below. In order for Defendants to prevail on their claims for Trademark Infringement under the Lanham Act pursuant to 15 U.S.C. § 1114, False Designation of Origin pursuant to 15 U.S.C. § 1125(a), and common law trademark infringement and common law unfair competition, FRG must show that (1) it has a valid, protectable trademark and (2) that CALLI BAKER'S use of a reproduction or colorable imitation of the trademark is

29

likely to cause confusion among consumers.[6]  Specifically, the Plaintiffs move for summary judgment on all of these claims on the ground that FRG cannot show a likelihood of confusion between CALLI BAKER'S use of the word "Firehouse" and FRG's Registrations, which include various forms of FIREHOUSE® and FIREHOUSE SUBS® marks used by the Defendants.[7]

A:    A genuine issue of material fact exists as to whether there is a likelihood of confusion between CALLI BAKER'S use of the word "Firehouse" and FRG's registered marks

A trademark includes any word, name, symbol, or device used by an individual to identify and distinguish his goods "from those manufactured or sold by others and . . . [to] indicate the source of the goods." 15 U.S.C. § 1127 (2009).  As the Fourth Circuit has explained,

---

[6]*See George & Co., LLC, v. Imagination Entm't Ltd.,* 575 F.3d 383, 393 (4th Cir. 2009) ("To establish trademark infringement, a plaintiff must prove that it owns a valid and protectable mark, and that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion." (citing 15 U.S.C. § 1114(1)(a))); *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 804 (4th Cir. 2001) ("A plaintiff asserting an infringement claim under the Lanham Act must prove that it has a valid, protectable trademark and that the defendant is infringing its mark by creating confusion, or a likelihood thereof, by causing mistake, or by deceiving as to the attributes of its mark."); *see also People for the Ethical Treatment of Animals v. Doughney,* 263 F.3d 359, 364 (4th Cir. 2001) (To state a claim for False Designation of Origin pursuant to § 1125(a), a party must allege facts establishing "(1) that it possesses a mark; . . . and (5) that the defendant used the mark in a manner likely to confuse consumers."); *Shakespeare Co. v. Silstar Corp. of Am., Inc.,* 802 F. Supp. 1386, 1399 (D.S.C. 1992), *rev'd on other grounds,* 9 F.3d 1091 (4th Cir. 1993) (noting that the elements of common law unfair competition and trademark infringement under South Carolina law are identical to the elements for proving a Lanham Act claim); *cf. Long Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 930 n.10 (4th Cir. 1995) ("The test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition . . .").

[7]FRG has asserted 34 trademarks and service marks registered on the Principal Register of the USPTO.  At the motions hearing, counsel for both parties agreed that 33 of the 34 marks are valid and protectable.  The Plaintiffs challenge the validity of the FIREHOUSE word mark only.

> A trademark puts the purchasing public on notice that all goods bearing the trademark: (1) originated from the same source; and (2) are of equal quality. *Retail Servs., Inc. v. Freebies Publ'g,* 364 F.3d 535, 538 (4th Cir. 2004). Thus, a trademark not only "protects the goodwill represented by particular marks," but also allows "consumers readily to recognize products and their source," preventing "consumer confusion between products and between sources of products." *OBX-Stock, Inc. v. Bicast, Inc.,* 558 F.3d 334, 339 (4th Cir. 2009).

*George & Co., LLC, v. Imagination Entm't Ltd.,* 575 F.3d 383, 392-93 (4th Cir. 2009) (citation omitted).

Whether CALLI BAKER'S use of the word "Firehouse" is likely to cause confusion to the "ordinary consumer" such that FRG has rights which prevail over CALLI BAKER'S is an "inherently factual" determination which is "particularly amenable to resolution by a jury." *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.,* 962 F.2d 316, 318 (4th Cir. 1992). Likelihood of confusion is "frequently a fairly disputed issue of fact on which reasonable minds may differ, and has long been recognized to be a matter of varying human reactions to situations incapable of exact appraisement." *Id.* (internal citation and quotation marks omitted).

A likelihood of confusion exists if "the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *CareFirst of Md., Inc. v. First Care, P.C.,* 434 F.3d 263, 267 (4th Cir. 2006) (citation omitted). In assessing whether such confusion exists, the court looks "to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.* Specifically, to determine if a likelihood of confusion exists, the court looks to

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

31

*George & Co.,* 575 F.3d at 393 (citing *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984)). "Not all of these factors are of equal importance, nor are they always relevant in any given case." *Id.* The actual confusion factor is the most significant. *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.,* 148 F.3d 417, 423 (4th Cir. 1998) (noting that "the best evidence of likely confusion is actual confusion."); *see also Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 804 (4th Cir. 2001) (stating evidence of actual confusion is "often paramount" in the likelihood of confusion analysis).

### 1. Strength of the Mark

The first likelihood of confusion factor focuses on the strength of the mark. "The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *CareFirst,* 434 F.3d at 269. Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark. The strength of a trademark is evaluated in terms of both conceptual strength and commercial strength. *Id.*

#### a. Conceptual Strength

A mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *George & Co.,* 575 F.3d at 393-94 (citation omitted). Arbitrary marks, which are inherently distinctive

> typically involve common words that have no connection with the actual product, as "they do not suggest or describe any quality, ingredient, or characteristic," so the mark can be viewed as "arbitrarily assigned." *Id.*; *see also id.* (noting that "Camel® cigarettes" and "Apple® computers" are arbitrary marks).

> Suggestive marks, which are also inherently distinctive, do not describe a product's features but merely suggests them. *Retail Servs.,* 364 F.3d at 538. In other words, the exercise of some imagination is required to associate a suggestive mark with the product. *Id.* Examples of suggestive marks are "Coppertone®, Orange Crush®, and Playboy®." *Sara Lee,* 81 F.3d 464.

*Id.* at 394.  The Defendants argue that their use of the FIREHOUSE® and FIREHOUSE SUBS® marks

is at least suggestive when used in connection with restaurant services and food and drink items.[8]  However,

this categorization does not end a court's evaluation of a mark's conceptual strength.  A court should

measure a mark's conceptual strength by focusing on the "linguistic or graphical 'peculiarity' of the

mark . . . considered in relation to the product, service, or collective organization to which the mark

attaches." *CareFirst,* 434 F.3d at 269 (internal citation omitted).  "A court must also consider other

registrations of the mark, because 'the strength of a commonly-used mark decreases as the number of third-

party registrations increases.'" *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.,* 227 F. App'x

239 (4th Cir. 2007) (citing *Pizzeria Uno,* 747 F.2d at 1531).  "'[T]he frequency of prior use of [a mark's

text] in other marks, particularly in the same field of merchandise or service,' illustrates the mark's lack

of conceptual strength." *CareFirst,* 434 F.3d at 270 (quoting *Pizzeria Uno,* 747 F.2d at 1530-31).  "A

strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak

trademark is one that is often used by other parties." *Id.* (concluding that CareFirst's mark, used in

connection with HMO health care organization, was weak because many health care businesses used some

variation of the words "care" and "first" in their marks); *see Petro Stopping Ctrs.,* 130 F.3d at 93-94

(recognizing that word "Petro" is commonly used in marks dealing with fuel stations; therefore, mark using

---

[8]Additionally, the USPTO requires applicants with marks found to be descriptive to
prove that the marks have secondary meaning before granting registration. 15 U.S.C.
§ 1052(f).  The fact that the USPTO did not require such proof with respect to the
FIREHOUSE word mark constitutes *prima facie* evidence that the FIREHOUSE word mark
is at least suggestive and therefore would be inherently distinctive. *See Petro Stopping Ctrs.
L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 92-93 (4th Cir. 1997) ("Because the PTO
did not require such proof with respect to Petro Stopping's applications for registration,
it can safely be assumed that the PTO believed the marks were at least suggestive."); *see
Resorts of Pinehurst,* 148 F.3d at 422 (stating fact that the USPTO registers a mark without
requiring proof that the mark has acquired secondary meaning is given significant weight).
Here, the Plaintiffs have not rebutted this presumption.

"Petro" within fuel service industry is weak). However, a mark weakened by third-party use may be rehabilitated by evidence of successful policing of the mark demonstrated by actual name changes in the marketplace, which lessens the diluting effect of third-party use. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.,* 405 F. Supp. 2d 680, 692 n.15 (E.D. Va. 2005).

Here, although the Defendants argue that their registered marks are at least suggestive and therefore inherently distinctive, the Plaintiffs have submitted evidence that suggests the FIREHOUSE word mark is conceptually weak. Specifically, the Plaintiffs argue that multiple other federal registrations imply that the term "Firehouse," standing alone, has no significant presence with the contemporary public.[9] (*See* Pls.['s] Exs. Y to BBB). Furthermore, an internet search of state-level government records for registered trademarks and corporations incorporating the "Firehouse" name reveals dozens, if not hundreds, of past and present users of the word "Firehouse"- both within and outside the food and beverage industry.[5] (*See* Pls.['s] Exs. EEE & FFF).[6] According to the Plaintiffs, if the FIREHOUSE word mark was truly a distinctive term, it is unlikely that so many other businesses in the food and beverage industry would independently think of using the term "Firehouse" in their marks or a mark similar to the FIREHOUSE

---

[9]4 Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:88 (Third-party use within an industry is evidence that "customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different [such] marks on the basis of minute distinctions.")

[10]*See id.* § 11:90 (Evidence of third-party registrations incorporating a common term are "relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that the segment is relatively weak.")

[11]Records from government websites are generally considered admissible and self-authenticating. Courts have also taken judicial notice, pursuant to Fed. R. Evid. 201, of information taken from government and media websites. *See generally Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.,* 405 F. Supp. 2d 680, 684 n.9 (E.D. Va. 2005) (taking judicial notice of website information in trademark infringement action).

34

word mark. *See CareFirst,* 434 F.3d at 270 ("That so many health care businesses have denominated themselves CareFirst or First Care indicates that 'CareFirst' is not a distinctive or unusual term in the industry, and hence not conceptually strong.").  However, the Defendants contend that the Plaintiffs' evidence demonstrates only *de minimis* third-party use of the term "Firehouse" in the restaurant industry and state that there is no evidence that consumers are aware of these third-party users.  The Defendants also claim that FRG has established a successful record of policing the FIREHOUSE® and FIREHOUSE SUBS® marks , which lessens the diluting effect of third-party use. (Sorensen Decl. ¶28; *see* Defs.['s] Ex. DD, Docket # 141-6).

## b. Commercial Strength

The second step in the "strength of the mark" analysis is to consider the mark's commercial strength, a concept similar to the "secondary meaning" inquiry considered in evaluating a mark's validity. *CareFirst,* 434 F.3d at 269 n.3.  Accordingly, the court "looks at the marketplace and asks if, in fact, a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *Id.* at 269.  While third-party use of a mark is relevant at this stage, as well, the court also considers a number of other factors, such as "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; [and] (5) attempts to plagiarize the mark . . . ." *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 125 (4th Cir. 1990); *Petro Stopping Ctrs. L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir. 1997).

As evidenced by the Defendants' use of the FIREHOUSE® and FIREHOUSE SUBS® marks and activities over the last sixteen years- tens of millions of dollars in advertising expenditures, over one billion dollars in sales, national and local recognition of awards, and aided and unaided consumer brand awareness

studies confirming significant consumer recognition in the marketplace- the FIREHOUSE SUBS® brand and marks appear commercially strong.  However, the Plaintiffs contend that the FIREHOUSE SUBS® brand and marketing surveys are not particularly helpful in the likelihood of confusion analysis of the FIREHOUSE word mark because (1) none of the surveys included participants from Myrtle Beach and, instead, appeared to have been taken in areas where FIREHOUSE SUBS® already has a significant presence; (2) the surveys did not compare FIREHOUSE SUBS® to other "Firehouse" restaurants and, instead, were limited to FRG's direct competitors (other sub shops); and (3) the results of the surveys do not indicate significant consumer association between the word "Firehouse" and the FIREHOUSE SUBS® brand.  Additionally, it appears that little, if any, of FRG's advertising expenditures are spent on the FIREHOUSE word mark, as there is little evidence that FRG uses the FIREHOUSE word mark alone in any of its marketing materials. (*See* Sorensen Dep., pp.126-27).  While the word "Firehouse" may be used in connection with another FRG registered mark, it appears that FRG exclusively uses a variation of one of its many FIREHOUSE SUBS® marks in all of its marketing material.  In assessing the *Perini* factors under the summary judgment standard, the record does not disclose that a substantial number of present or prospective customers, when hearing or reading the word "Firehouse," would associate the word specifically with the FIREHOUSE SUBS® brand. *See Petro Stopping Ctrs.,* 130 F.3d at 93 ("[S]trength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.").  As such, genuine issues of material fact remain in dispute concerning the strength of the FIREHOUSE word mark.

### 2. Similarity Between the Parties' Marks

In determining similarity of the marks under the second likelihood of confusion factor, the "focus [is] on whether there exists a similarity in sight, sound, and meaning which would result in confusion."

36

*George & Co.,* 575 F.3d at 396 (citing *Pizzeria Uno,* 747 F.2d at 1534-35). Moreover, courts generally focus on the dominant portions of the parties' marks. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 936 (4th Cir. 1995). The fact that the marks might share a common element alone is insufficient to establish a likelihood of confusion. *Petro Stopping Ctrs.,* 130 F.3d at 93-94. If one of the two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the marks. *CareFirst,* 434 F.3d at 271 (citing *AutoZone, Inc. v. Tandy Corp.,* 373 F.3d 786, 797 (6th Cir. 2004)).

The marks at issue in this case share the common term "Firehouse." It appears that many of the marks also employ the same red, yellow, and white color schemes. However, the Plaintiffs argue that the dominant portion of the Plaintiffs' mark is "CALLI BAKER'S." For the ten years prior to Scurmont's purchase, the restaurant had operated under the name "Calli Baker's Roadhouse Bar & Grill." After the restaurant was purchased by Scurmont, it was renamed "Calli Baker's Firehouse Bar & Grill" to convey the new "firehouse" theme while retaining the value of the "CALLI BAKER'S" name. Therefore, the Plaintiffs argue that "CALLI BAKER'S" continues to be the dominant, source-identifying portion of the mark, while the "Firehouse Bar & Grill" portion is merely descriptive of a firehouse theme and the services provided. Both before and after the name change, the restaurant has, and continues to be, commonly referred to by the shortened name "CALLI BAKER'S." (Debbie Breyare Aff. ¶¶ 4-10). The Court refrains from determining whether the use of the words "CALLI BAKER'S" and the slight variations in styling sufficiently differentiates the Plaintiffs' marks from FRG's registered marks; however, these differences lessen the possibility that the marks are so similar as to cause confusion. *See Wonder Works v. Cranium, Inc.,* 455 F. Supp. 2d 453, 459 (D.S.C. 2006). Additionally, the manner in which the marks are used and viewed by the public may mitigate any possible confusion. The Defendants' representatives testified that

37

use of the FIREHOUSE word mark is limited to the verbal greeting offered to customers as they enter a FIREHOUSE SUBS® restaurant. (*See* Sorensen Dep., p.193; Deborah Duncan Dep., pp.35-37; Bryan Paquin Dep., pp.33-35). Further, the Defendants have failed to indicate any instance in which the advertising or marketing for FIREHOUSE SUBS® utilized the FIREHOUSE word mark to identify the restaurant. (*See* Sorensen Dep., pp.126-27). Thus, "the substantial differences in the public presentations of these marks [may] significantly reduce the likelihood of confusion, notwithstanding their textual similarity." *CareFirst*, 434 F.3d at 271 (stating a proper analysis must focus on the actual use of the competing marks, and a comparison which takes only the texts of the marks is insufficient if the marks have different appearances in the marketplace).

### 3. Similarities in the Parties' Goods or Services

As with the similarity of the marks, courts must measure the similarity of goods or services with respect to each party's actual performance in the marketplace. *CareFirst,* 434 F.3d at 272. With regard to the similarity of the goods or services identified by the marks, "the goods in question need not be identical or in direct competition with each other." *George & Co.,* 575 F.3d at 397 (citation omitted). The Fourth Circuit has held that where the "products and services provided by the two companies serve the same purpose," this factor weighs in favor of a likelihood of confusion. *Lone Star Steakhouse & Saloon,* 43 F.3d at 937 (quoting *Pizzeria Uno,* 747 F.2d at 1535). In *Pizzeria Uno,* the Fourth Circuit held that the parties offered similar services despite the fact that the plaintiff offered Italian cuisine and a full bar in a sit-down restaurant while the defendant offered drive-through and counter service for Mexican food. *Pizzeria Uno*, 747 F.3d at 1522.

While there are notable differences in the menus at CALLI BAKER'S and FIREHOUSE SUBS®, both serve the same purpose: providing restaurant and catering services to the general public in the greater

Myrtle Beach, South Carolina area.  Additionally, both offer dine-in and take-out lunch and dinner meals; sandwiches; drinks; chili; and salads.  Further, both restaurants service the same types of customers: men, women, and children of all ages.  As "both parties operate restaurants and are in food service," this factor may weigh in favor of a likelihood of confusion. *See Pizzeria Uno*, 747 F.3d at 1535.

### 4. Similarity of Facilities

The fourth factor in the likelihood of confusion analysis is the similarity of the facilities used by the parties. *George & Co.,* 575 F.3d at 393.  In weighing the similarity of the respective facilities, "the court is to consider . . . the context in which [consumers] make their purchases." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.,* 227 F. App'x 239 (4th Cir. 2007) (citation omitted). Other Circuits have held that this factor will weigh in favor of the alleged infringer when there are "basic differences between plaintiff's and defendant's modes of distributing their products." *See, e.g., Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 262 (5th Cir. 1980). Here, CALLI BAKER'S is located in a stand-alone building with visible signage both on the building and adjacent to the highway in front of the restaurant and features a large fire engine in clear view of passing customers.  In addition, CALLI BAKER'S has an enclosed outdoor eating area that is visible from the exterior, but can be entered only from the inside of the restaurant.  CALLI BAKER'S also includes a dining room and separate bar and smoking area.  Further, CALLI BAKER'S is a full-service establishment with a host stand and several wait-staff stations throughout the restaurant.  In short, CALLI BAKER'S is a full-service, sit-down restaurant: customers are seated by a host or hostess and orders are taken at the customer's table with food and drinks delivered to the table by the wait staff.

In contrast, the FIREHOUSE SUBS® establishments at issue in this case are located in strip malls anchored by either a Wal-Mart or a Bi-Lo store.  They sit adjacent to an oversized parking lot and have

minimal storefront exposure. Additionally, FIREHOUSE SUBS® restaurants strictly adhere to the FIREHOUSE SUBS® store layout and building requirement plans. Customers enter the restaurant and, as with all other FIREHOUSE SUBS® locations, there is a counter directly to one side where the food products are prepared. At the end of the counter farthest from the entrance there are cash registers where customer orders are taken and payment is received. As the customers exit from the register area, there is a self-service beverage station where the customers can prepare their own drinks. Both drinks and potato chips are self-service. Unlike CALLI BAKER'S, FIREHOUSE SUBS® facilities do not allow for customers to sit and order at a bar, order from wait staff, or be seated on an outdoor patio.

### 5. Similarity of Advertising

Another factor to be considered is the similarity of the advertising used by the two parties. *Pizzeria Uno,* 747 F.2d at 1527. In comparing advertising, courts examine a variety of factors: the media used, the geographic areas in which the advertising occurs, the appearance of the advertisements, and the content of the advertisements. *CareFirst,* 434 F.3d at 273 (internal citations omitted). Here, at least three of these four factors show significant differences between the two parties' advertising. CALLI BAKER'S "advertises" primarily through word of mouth and spends very little money on advertising. (*See* Scurfield Dep., pp.90-107). CALLI BAKER'S advertising efforts have consisted of print advertising, such as coupon books, direct mailing to people in the Myrtle Beach area, and a website. In contrast, FRG employs outside marketing firms to conduct advertising campaigns on behalf of the entire FIREHOUSE SUBS® system. FRG advertises via radio, television, and billboard, and has spent tens of millions of dollars on advertising over the past ten years. However, FRG also utilizes print advertising.

### 6. Intent of the Alleged Infringer

"The intent of a junior user is relevant only if the junior user intended to capitalize on the good will associated with the senior user's mark." *CareFirst,* 434 F.3d at 273. Initially, the Plaintiffs asserted an advice of counsel defense claiming they, in good faith, conferred with a lawyer prior to renaming the restaurant "Calli Baker's Firehouse Bar & Grill." The Plaintiffs have since withdrawn their advice of counsel defense. (*See* Stipulation of Counsel, Docket # 139). The Defendants argue that Scurfield was aware of FIREHOUSE SUBS® prior to purchasing and changing the name of his restaurant. The Plaintiffs argue that Scurfield never intended to capitalize on the good will associated with FRG's registered marks. This is a question of fact for the jury.

### 7. Actual Confusion

Evidence of actual confusion is "often paramount" in the likelihood of confusion analysis. *CareFirst,* 434 F.3d at 268. "Actual confusion can be demonstrated by both anecdotal and survey evidence. Evidence of only a small number of instances of actual confusion may be dismissed as *de minimis.*" *George & Co.,* 575 F.3d at 398 (internal citations omitted); *see Petro Stopping Ctrs.,* 130 F.3d at 95 (concluding that evidence of actual confusion consisting of only a few instances out of more than $2 billion in sales was "at best *de minimis*."). Here, the evidence reveals that both parties have experienced some instances of actual confusion. Shortly after CALLI BAKER'S relocated to its current location, a few customers began to inquire about the affiliation between CALLI BAKER'S and FIREHOUSE SUBS®. In fact, the Plaintiffs admit that customers at CALLI BAKER'S have asked a CALLI BAKER'S employee whether CALLI BAKER'S is a FIREHOUSE SUBS® restaurant on at least three occasions. Similarly, Three Alarm and Fireside began receiving inquiries from customers asking about their restaurants' affiliation with CALLI BAKER'S. Employees of Three Alarm claim to have received between 10 and 50 telephone calls and

41

encountered 10 to 15 instances of in-store customer inquiries about the affiliation between Three Alarm and CALLI BAKER'S. (*See* Bryan Paquin, Jr. Decl. ¶¶5-6, Docket # 137-9; Laura Whitesides Decl. ¶¶8-9, Docket # 137-11; Robert Blakenship Decl. ¶6, Docket # 137-8; *see also* Mary Paquin Decl. ¶¶6-7 & 10, Docket # 137-7). Fireside also claims that it received a few phone calls in 2008 and/or 2009 inquiring into its location and whether it served alcohol. (Deborah Duncan Dep., pp.78-83). However, the extent of any actual confusion and whether these instances of confusion may be dismissed as *de minimis* is unclear from the evidence presented.

### 8. Remaining Factors

Counsel for the parties agree that the remaining factors in the likelihood of confusion analysis have no relevance in this case. Factor eight, the quality of the defendant's product applies in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 467 (4th Cir. 1996). Here, that is not the case. The ninth factor, the sophistication of the consuming public, is only applicable "when the relevant market is not the public at-large." *Id.* Here, the relevant market is the public at-large.

In sum, the Court has considered all of the likelihood of confusion factors and finds that there are genuine issues of material fact with respect to whether there is a likelihood of confusion between CALLI BAKER'S use of the word "Firehouse" and FRG's registered marks. The Court finds that the determination of likelihood of confusion in this case is "particularly amenable to resolution by a jury." *Anheuser-Busch,* 962 F.2d at 318. Thus, the Court denies the Plaintiffs' Motion for Partial Summary Judgment.

42

**V:**     **Defendants' Motion for Partial Summary Judgment**

      In their Motion for Partial Summary Judgment, the Defendants move for summary judgment on all counts asserted in the Second Amended Complaint and all remaining counterclaims. As noted above, the Court finds that a genuine issue of material fact exists as to whether there is a likelihood of confusion between CALLI BAKER'S use of the word "Firehouse" and FRG's registered marks. Because a likelihood of confusion is an essential element of the following claims, the Defendants' Motion for Partial Summary Judgment is denied as to the following causes of action: (1) Plaintiffs' First Cause of Action for Declaratory Judgment of Non-Infringement, (2) Defendants' First Counterclaim for Trademark Infringement pursuant to 15 U.S.C. § 1114, (3) Defendants' Second Counterclaim for False Designation of Origin pursuant to 15 U.S.C. § 1125(a), and (4) Defendants' Third Counterclaim for Common Law Trademark Infringement and Unfair Competition. Thus, the Court will now address the two remaining claims in the Second Amended Complaint- (1) Plaintiffs' Second Cause of Action for violation of the South Carolina Unfair Trade Practices Act and (2) Plaintiffs' Third Cause of Action for Trademark Cancellation Due to Fraud- and the one remaining counterclaim- (1) Defendants' Counterclaim for Unjust Enrichment.

**A:**     <u>Plaintiffs' Second Cause of Action for Violation of the South Carolina Unfair Trade Practices Act</u>

      The Defendants argue that they are entitled to summary judgment on the Plaintiffs' South Carolina Unfair Trade Practices Act ("SCUTPA") claim for two reasons: (1) Plaintiffs and their experts have not identified, quantified, or calculated any amount of recoverable damages, and (2) Plaintiffs have produced no evidence of an unfair or deceptive trade practice. In response to the lack of damages argument, the Plaintiffs argue:

                Scurmont, LLC has borrowed significant funds from the Somerset Trust Company line of credit in order to pay attorneys' fees, expert witness fees, and other costs in defending the litigation. Although attorneys' fees are not damages, the significant *interest* that is accruing on the loan is not part of

43

> attorneys' fees, and is a separate element of damage to the Plaintiffs. The interest on the loan, for which Plaintiff's are responsible, is a financial loss sustained directly as a result of Defendants' assertion of a fraudulently obtained trademark.

(Pls.['s] Br. in Opp'n to Defs.['s] Mot. for Summ. J., p.31, Docket # 147). Further, the Plaintiffs argue that there is a genuine issue of material fact as to whether the Defendants have engaged in an unfair or deceptive trade practice.

To maintain a private cause of action under the SCUTPA, a plaintiff need only establish: "(1) that the defendant[s] engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant[s'] use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendants had an adverse impact on the public interest." *Havird Oil Co. v. Marathon Oil Co.,* 149 F.3d 283, 291 (4th Cir. 1998); *see* S.C. Code Ann. § 39-5-20 (2006) (The SCUTPA declares unlawful any "unfair . . . acts or practices in the conduct of any trade or commerce."). Accordingly, the act or trade practice complained of must be unfair or deceptive. *See, e.g., Camp v. Springs Mortgage Corp.,* 426 S.E.2d 304, 306 (S.C. 1993). Under the SCUTPA, an act or trade practice is unfair "when it is offensive to public policy or when it is immoral, unethical, or oppressive." *Gentry v. Yonce,* 522 S.E.2d 137, 143 (S.C. 1999). Section 39-5-140(a) creates a private right of action to recover actual damages in favor of "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 . . . ." S.C. Code Ann. § 39-5-140(a).   "Actual damages under the [SC]UTPA include special or consequential damages that are a natural and proximate result of deceptive conduct." *Collins Holding Corp. v. Defibaugh,* 646 S.E.2d 147, 149 (S.C. Ct. App. 2007) (quoting *Global Prot. Corp. v. Halbersberg,* 503 S.E.2d 483, 488 (S.C. Ct. App. 1998)). Section 39-5-140(a) further provides, "[u]pon the finding by the court of a violation of this article, the court shall award to the person

44

bringing such action under this section reasonable attorney's fees and costs." S.C. Code Ann. § 39-5-140(a). Thus, "actual damages are distinct from attorneys' fees." *Mull v. Ridgeland Realty, LLC,* 693 S.E.2d 27, 32 (S.C. Ct. App. 2010).

The Court finds that the Defendants are entitled to summary judgment on the Plaintiffs' SCUTPA claim because the Plaintiffs cannot show that they suffered actual, ascertainable damages as a result of the Defendants' alleged use of an unlawful trade practice. As the Plaintiffs concede, attorney's fees are not actual damages. A finding by this Court that the Plaintiffs' SCUTPA cause of action to recover interest on a loan obtained to pay attorneys' fees survives summary judgment would eviscerate the rule that attorneys' fees themselves do not constitute actual damages sufficient to maintain a claim under SCUTPA. *See Mull,* 693 S.E.2d at 32. The Plaintiffs argue that "costs" incurred by a party in defending an action are appropriate damages under the SCUTPA; however, such an argument contradicts § 39-5-140(a), which provides for the award of reasonable attorney's fees and costs only after all elements have been proved and a violation of the SCUTPA has been found. *See* S.C. Code Ann. § 39-5-140(a) ("Upon the finding by the court of a [SCUTPA violation], the court shall award . . . reasonable attorney's fees and costs."). The Plaintiffs' argument is further contradicted by *Mull*. *See id.* at 32. Moreover, a plaintiff is only entitled to compensation for all loss of money or property "which is the natural and probable consequence of defendant's wrong" under the SCUTPA. *Collins Holding Corp.,* 646 S.E.2d at 149. Although not discussed in the context of a SCUTPA claim, the South Carolina Supreme Court has held that "finance charges are not damages naturally and proximately arising . . . and accordingly are not consequential damages." *Long v. Quality Mobile Home Brokers, Inc.,* 248 S.E.2d 311, 313 (S.C. 1978).

Similarly, the Plaintiffs cannot produce admissible evidence to show that the defendants' alleged unlawful acts caused an ascertainable amount of lost profits. In order to recover damages for lost profits

45

under the SCUTPA, a plaintiff must establish that the alleged unfair or deceptive trade practice is the *cause* of the lost profits *and* that the *amount* of such damages can be established with reasonable certainty. *See, e.g., Global Prot. Corp.,* 503 S.E.2d at 488.   The Plaintiffs have established neither in this case. Specifically, the Plaintiffs have failed to establish that they suffered any lost profits as a result of receiving Defendants' cease and desist letter and/or as a result of the inability to utilize the word "Firehouse" in a marketing campaign.  The Plaintiffs' own expert concluded that there was no nexus between the use of the word "Firehouse" in CALLI BAKER'S name and CALLI BAKER'S loss of business.   Specifically, the Plaintiffs' own damages expert, Charles L. Alford, III, opined that CALLI BAKER'S performed poorly both *prior* to Scurfield's acquisition of the restaurant in 2005 and *subsequent* to the name change.  Notably, Mr. Alford opined that the "Firehouse" name added no benefit whatsoever to CALLI BAKER'S profitability. (*See* Expert Report of Charles Alford, III, Docket # 138-12). More troubling to the Plaintiffs' SCUTPA claim is that, had they opted to conduct their marketing and advertising campaigns despite receiving the cease and desist letter, Plaintiffs do not know whether the campaigns would have increased CALLI BAKER'S revenues at all. (Scurfield Dep., pp.308-310).  Because the Plaintiffs cannot show that they suffered actual, ascertainable damages as a result of the Defendants' alleged use of an unfair or deceptive trade practice, the Court grants the Defendants' Motion for Partial Summary Judgment as to the Plaintiffs' Second Cause of Action for violation of the South Carolina Unfair Trade Practices Act.

B:    Plaintiffs' Third Cause of Action for Trademark Cancellation Due to Fraud

Plaintiffs' Third Cause of Action for Trademark Cancellation Due to Fraud alleges that FRG committed fraud before the USPTO and, therefore, the FIREHOUSE word mark should be cancelled.  In any action involving a registered mark, a court may order the cancellation of the registration, in whole or in part, when such action is warranted. 15 U.S.C. § 1119.  Fraud in the procurement of a trademark

46

registration is also a defense to a claim of trademark infringement. *See, e.g., Lone Star Steakhouse & Saloon,* 43 F.3d at 931 n.12. "Fraud on the [USPTO] in connection with trademark registration requires that the following elements be alleged and proven: (1) The challenged statement was a *false* representation regarding a *material* fact[;] (2) The person making the representation *knew* that the representation was false ('scienter')[;] (3) An *intent to deceive* the USPTO[;] (4) Reasonable *reliance* on the misrepresentation[; and] (5) *Damage* proximately resulting from such reliance." J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 31:61 (West 2010). Conclusory allegations that a trademark holder knew of a third-party's rights to use a mark or conclusory allegations concerning prior use of a mark are deficient. *King Auto., Inc. v. Speedy Muffler King, Inc.,* 667 F.2d 1008, 1010-11 (C.C.P.A. 1981). Additionally, even a material misrepresentation will not qualify as fraud under the Lanham Act warranting cancellation absent the requisite intent to deceive the USPTO. *Id.* at 1011 n.4; *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1352 (Fed. Cir. 1999) (noting that even if others' use was significant, in order to cancel the mark there must be a showing that a false declaration was submitted with the intent to deceive) As such, a trademark is obtained fraudulently only if the applicant or registrant "knowingly makes a false, material representation with the intent to deceive the [USPTO]. *In re Bose Corp.,* 580 F.3d 1240, 1245 (Fed. Cir. 2009).

Specifically, the Plaintiffs claim that FRG

> submitted its oath, pursuant to 18 U.S.C. § 1001, that to the best of its knowledge and belief no other person, firm, corporation or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in commerce with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive . . . . [despite the fact that] FRG knew that there were many other pre-existing food and beverage businesses with the name FIREHOUSE or some substantially similar variation thereof.

47

(Second Amended Compl. ¶¶45 & 47, Docket # 46). Firehouse Grill & Pub, which has been registered and doing business in Tampa, Florida, since October 4, 1990, is one of the alleged pre-existing businesses using the FIREHOUSE word mark at issue in this case. In August 2002, more than six months before FRG filed the FIREHOUSE word mark application, it learned about the Firehouse Grill & Pub in Tampa, Florida. (*See* Defs.['s] Ex. G-1, Docket # 138-14). Robin Sorensen's communications with Mr. Kanji, a FIREHOUSE SUBS® franchisee, evidence that he believed and understood that the Firehouse Grill & Pub "may have superior rights" to the FIREHOUSE word mark. *Id.* In fact, in his deposition, Robin Sorensen admitted that he knew, at the time the FIREHOUSE word mark application was filed, that the Firehouse Grill & Pub had a superior right to use the FIREHOUSE word mark, and there was some concern that there would be a likelihood of consumer confusion. (Sorensen Dep., pp.85-88). Communications continued for several months between Robin Sorensen and Mr. Kanji regarding the presence of the Firehouse Grill & Pub in Tampa, and concerns regarding FIREHOUSE SUBS® entering the Tampa market. (*Id.* at 54-60). On March 8, 2003 (just four days before submitting the FIREHOUSE word mark application), Robin Sorensen and one of his colleagues traveled to Tampa to investigate the Firehouse Grill & Pub. (*Id.* at 62-63). According to Robin Sorensen, the owner of the Firehouse Grill & Pub did not have any concerns about FIREHOUSE SUBS® opening a restaurant in the Tampa area. (*Id.* at 64).

Although FRG claims that the FIREHOUSE word mark application was submitted only after Robin Sorensen and the owner of the Firehouse Grill & Pub had reached a coexistence agreement, there is arguably some evidence that indicates otherwise. The record reveals that an agreement may not have been reached until after FRG applied for the FIREHOUSE word mark. On April 2, 2003, over twenty days after submitting the FIREHOUSE work mark application, Robin Sorensen wrote a letter to the owner of the Firehouse Grill & Pub, in which he proposed a coexistence agreement and enclosed a check for $5,000.

48

(Defs.['s] Ex. G-3, Docket # 136-17).  Under the proposed agreement, the Firehouse Grill & Pub would be required to "consent[]" to FRG's use of its trademarks, including "FIREHOUSE" and "FIREHOUSE SUBS," "even if such uses or activities may cause confusion, dilution or otherwise conflict with Grill & Pub's use of the business name 'The Firehouse Grill & Pub' or any of Grill & Pub's trademarks or service marks." (*Id.*).  Notably, with regard to the issues of senior rights to the FIREHOUSE word mark and possible likelihood of confusion, Robin Sorensen also offered: "We will continue our growth elsewhere if you are uncomfortable with this arrangement." (*Id.*).

Whether FRG believed, in good faith, that there would be no likelihood of confusion, upon FIREHOUSE SUBS® entry into the Tampa market, is a question that will require assessment of the witnesses' credibility in light of the evidence before the Court.  For example, Robin Sorensen contends that he believed there was no likelihood of confusion between the Firehouse Grill & Pub, a restaurant that served bar food and alcohol, and FIREHOUSE SUBS®. (Sorensen Dep., p.50).  However, he now contends that CALLI BAKER'S, a restaurant that also serves bar food and alcohol, is essentially a direct competitor and the same type of restaurant as FIREHOUSE SUBS®.  A jury must assess the credibility of Robin Sorensen's testimony in this regard, as well as his testimony that he did not think there was any "issue" because, as far as he knew, the Firehouse Grill & Pub was not doing business in interstate commerce.  The facts outlined above demonstrate a genuine issue of material fact for the jury on the issue of the Defendants' alleged fraud on the USPTO.  Therefore, the Defendants' Motion for Partial Summary Judgment is denied as to this claim.

49

C:    Defendants' Counterclaim for Unjust Enrichment

The Defendants have also moved for summary judgment on their counterclaim for unjust enrichment. "Unjust enrichment is an equitable doctrine, akin to restitution, which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff." *Ellis v. Smith Grading &Paving, Inc.,* 366 S.E.2d 12, 14 (S.C. Ct. App. 1988). To recover on a theory of restitution, the party pleading unjust enrichment must establish: (1) conferral of a nongratuitous benefit on the opposing party; (2) the opposing party realized some value from the benefit; and (3) it would be inequitable for the opposing party to retain the benefit without paying its value. *Moore-Hudson Oldsmobile/GMC, Inc. v. Waterman,* 378 S.E.2d 279, 280 (S.C. Ct. App. 1989). A party may be unjustly enriched when it has and retains benefits or money which in justice and equity belong to another. (*Id.*). At the motions hearing, counsel for the Defendants advised the Court that they were not seeking damages in this dispute. Based on the Defendants' counsel's statement that they are only seeking injunctive remedies, it appears that the Defendants are no longer pursuing this claim.

## Conclusion

Based on the foregoing, it is **ORDERED** that:

(1) Defendants' [77] Motion to Strike Expert Witness Report of William O. Bearden and to Exclude the Testimony of William O. Bearden at Trial is **granted in part, denied in part**. Specifically, Dr. Bearden is precluded from testifying as to "6. Alleged Infringer's Intent" and "7. Actual Confusion";

(2) Plaintiffs' [79] Motion in *Limine* to Exclude Testimony and Report of George M. Thomas is **granted in part, denied in part**. Specifically, Mr. Thomas is precluded from testifying as to the materiality of FRG's actions before the USPTO, whether FRG acted with deliberate intent before the USPTO, whether

50

FRG's conduct before the USPTO was fraudulent, or the similarity of the parties' marks and any perceived connection between the parties' respective restaurants;

(3) Plaintiffs' [80] Motion in *Limine* to Exclude Testimony and Rebuttal Report of Dr. Sealey is **denied**;

(4) Plaintiffs' [81] Motion for Partial Summary Judgment is **denied**; and

(5) Defendants' [135] Motion for Summary Judgment or, in the alternate, Partial Summary Judgment is **granted in part, denied in part**. Specifically, the Court grants the Defendants' Motion for Partial Summary Judgment as to the Plaintiffs' Second Cause of Action for violation of the South Carolina Unfair Trade Practices Act. The Defendants' counterclaim for Unjust Enrichment is deemed withdrawn or moot.

Additionally, the Court instructed the parties in court and via Text Order to advise the Court of their position on realignment. At the motions hearing, counsel for CALLI BAKER'S advised the Court that she had no objection to realignment as Defendants asserting a counterclaim for Trademark Cancellation Due to Fraud. Counsel for FRG has not notified the Court of any objection to realignment as the Plaintiffs as previously requested by FRG's counsel in an earlier motion and also suggested by the Court at the motions hearing for an orderly disposition of this case. Therefore, the parties shall be realigned in this dispute so that (1) Firehouse Restaurant Group, Inc., a Florida corporation, (2) Three Alarm Subs, Inc., a South Carolina corporation, and (3) Fireside Restaurant Company, Inc., a South Carolina corporation are designated as <u>Plaintiffs</u>, **AND** (1) Scurmont LLC, d/b/a Calli Baker's Firehouse Bar & Grill and (2) Heath Scurfield, an individual, are designated as <u>Defendants.</u>

      **AND IT IS SO ORDERED.**

                                              s/ R. Bryan Harwell
                                              R. Bryan Harwell
                                              United States District Judge

July 8, 2011
Florence, South Carolina

51